Petition for review denied by unpublished PER CURIAM opinion. Judge DAVIS wrote a dissenting opinion.
Unpublished opinions are not binding precedent in this circuit.
PER CURIAM:
Akouavidovi Djondo, a native and citizen of Togo, was admitted into the United States in April 2005. Several months later, Djondo applied for asylum, withholding of removal, and protection under the Convention Against Torture (“CAT”). An Immigration Judge (“IJ”) denied her application after making an adverse credibility finding, and the Board of Immigration Appeals (“BIA”) affirmed the IJ’s decision.* Djondo now petitions for review, arguing that the BIA’s decision is not supported by the record and the BIA failed to follow the requirements of the REAL ID Act. For the reasons that follow, we deny the petition for review.
I.
A.
Djondo is a native and citizen of Togo who entered the United States in April 2005. Djondo filed her application for asylum, withholding of removal, and protection under CAT on August 24, 2005, alleging that she had been persecuted in her home country for her political beliefs.
Togo had been under the control of General Gnassingbe Eyadema from 1967 until his death in 2005. While General Eyade-ma was in power, Djondo worked to bring political change in Togo as a member of the opposition political party, the Convention Democratique des Peuples Afrieains (“CDPA”). When General Eyadema died on February 5, 2005, his son, Faure Gnas-singbe, was installed as Togo’s next president by the Rally of the Togolese People (“RTP”), the political party of his father. Faure Gnassingbe stepped down under international pressure on February 25. According to reports from the State Department and Amnesty International, two days later, on February 27, in response to the political upheaval in the country, a women’s group that was part of the CDPA held a protest in Lome, Togo, during which the participants wore red. This rally was broken up when RTP security forces attacked the protestors, eventually resulting in five deaths.
B.
Djondo’s application was based on her claim that she was attacked at this red-shirt rally in Lome. In her written application and in her testimony before the IJ, Djondo stated that she participated in the red-shirt rally and that after RTP security forces broke up the rally, they spotted her and attacked her, causing her to lose consciousness for a short time. According to Djondo, she eventually was assisted to her cousin’s house, and her cousin took her to the hospital for treatment. Djondo then returned to her cousin’s house to hide from the security forces. Throughout her written and oral testimony, Djondo gave February 20 as the date of the rally where she was attacked.
In addition to her own testimony, Djon-do offered the affidavit and testimony of her half-sister, Massan Gnininvi. Gnininvi testified that the rally was on February 20, that Djondo had attended the rally, and that, although Gnininvi was not present when Djondo was attacked, Gnininvi heard that people were beaten at the rally. Gni-ninvi’s affidavit provides a similar account, including the February 20 date.
Djondo also offered written, unsworn statements from six Togolese citizens. *340 The statement from Edoh Komla, Djondo’s cousin, states that Djondo came to his house after the rally and hid there. Like Djondo and Gnininvi, he claims that the rally at which Djondo was beaten took place on February 20.[1] Two statements were from other members of the CDPA, who stated that Djondo was beaten by security forces at a rally in which participants wore red shirts. A statement from Djondo’s husband claimed that Djondo was assaulted by security forces during a march, but that statement does not specify which march, other than saying the march was organized by women of the opposition party. The fifth statement is from Djon-do’s mother, who said that Djondo had been a long-time opponent of the government. Her mother’s statement did not discuss any details of the protest in February 2005, other than saying it was “the last straw that broke the camel[’]s back.” J.A. 685. The sixth and final statement was from the man who helped Djondo get to the United States; it said nothing specific about a rally in February 2005.
Finally, Djondo offered photographs of the rally, her CDPA membership card, and an attestation of her CDPA membership. She also included country reports on Togo from the State Department and Amnesty International.
C.
The IJ rejected Djondo’s application.[2] The IJ found that the evidence showed that Djondo was a member of the CDPA but did not support a credible claim that she was entitled to the relief she sought. Applying the REAL ID Act, 8 U.S.C. § 1158(b)(l)(B)(iii), the IJ stated that Djondo’s “claim is not consistent with the evidence that she provided on country conditions” and that there was a “discrepancy which relates to [Djondo’s] claim of having been arrested and detained during the course of the march that she described as having occurred on February 20, 2005.” J.A. 14. The IJ did not find credible Djondo’s explanation that she forgot or could not remember the correct date. Regarding the supporting documents, the IJ noted that one document used the same incorrect date — February 20, 2005 — -for the red-shirt rally and that the other documents lacked specifics about the rally at which Djondo claimed she was attacked. The IJ likewise decided that the photographs of the rally were insufficient because Djondo could not be seen in them.
The BIA affirmed the IJ’s decision. The BIA, also applying the REAL ID Act, upheld the IJ’s credibility determination. It noted that Djondo’s testimony and written application, as well as Gnininvi’s testimony and affidavit and Edoh Komla’s letter, all used the same incorrect date of February 20, 2005. The BIA also upheld the IJ’s determination that the other evidence did not support Djondo’s claim, concluding that the evidence was “insufficient to bolster [Djondo’s] already questionable version of events.” J.A. 5.
II.
Djondo now petitions for review of the denial of her claim for asylum, withholding of removal, and protection under CAT. When reviewing the BIA’s decision, we must uphold the decision so long as it is not “manifestly contrary to law.” 8 U.S.C. § 1252(b)(4)(C). Thus, we must accept the BIA’s decision unless the evidence “compels ” a contrary conclusion. Dankam v. *341 Gonzales, 495 F.3d 118, 119 (4th Cir.2007) (quoting I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)) (emphasis in original).
An IJ’s determination of a witness’s credibility is governed by the REAL ID Act, which provides:
Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant’s or witness’s account, the consistency between the applicant’s or witness’s written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant’s claim, or any other relevant factor.
8 U.S.C. § 1158(b)(1)(B)(iii). The IJ’s findings that an applicant was not credible are “entitled to judicial deference if such findings are supported by substantial evidence.” Dankam, 495 F.3d at 119.
Although the IJ’s findings of fact are given broad deference, that deference is not absolute. Camara v. Ashcroft, 378 F.3d 361, 367 (4th Cir.2004). For the court to uphold a decision that the witness was not credible, an IJ “should offer a specific, cogent reason for [her] disbelief.” Id. “Examples of specific and cogent reasons include inconsistent statements, contradictory evidence, and inherently improbable testimony; [in particular,] where these circumstances exist in view of the background evidence on country conditions, it is appropriate for an Immigration Judge to make an adverse credibility determination on such a basis.” Tewabe v. Gonzales, 446 F.3d 533, 538 (4th Cir.2006) (alteration in original) (internal quotation mark omitted). On the other hand, that determination may not be based on “speculation, conjecture, or an otherwise unsupported personal opinion.” Id. (quoting Dia v. Ashcroft, 353 F.3d 228, 250 (3d Cir.2003) (en banc)).
The Immigration and Nationality Act (“INA”) authorizes the Attorney General to grant asylum to an alien who qualifies as a refugee under 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(b)(1)(A); see also Dankam, 495 F.3d at 115. A refugee is “someone ‘who is unable or unwilling to return to’ [her] native country ‘because of persecution or a well-founded fear of persecution on account of ... political opinion’ or other protected grounds.” Id. (quoting 8 U.S.C. § 1101(a)(42)(A)) (omission in original). Proving a well-founded fear of persecution has both a subjective and an objective component. Camara, 378 F.3d at 369. Alternatively, if a petitioner can show past persecution, a presumption of a well-founded fear arises. Id. at 369-70. Thus, even if the trier of fact has determined that the petitioner’s testimony is not credible, the BIA must consider independent evidence of past persecution. Anim v. Mukasey, 535 F.3d 243, 252 (4th Cir.2008). The person seeking asylum has the burden of showing that she meets these requirements. Djadjou v. Holder, 662 F.3d 265, 272 (4th Cir.2011).
The INA also provides for the withholding of removal. 8 U.S.C. § 1231(b)(3). The burden for prevailing on this claim is higher than under an asylum claim because to succeed on the withholding claim, the petitioner must “demonstrate a ‘clear probability of persecution’ on account of a protected ground.” Dankam, 495 F.3d at *342 115 (quoting INS v. Stevic, 467 U.S. 407, 430, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984)). Protected grounds include “race, religion, nationality, membership in a particular social group, or political opinion.” Haoua v. Gonzales, 472 F.3d 227, 232 (4th Cir.2007) (citing 8 U.S.C. § 1231(b)(3)(A)). Because the burden of proof for withholding of removal is higher than for asylum, an applicant who is ineligible for asylum is necessarily ineligible for withholding of removal. Camara, 378 F.3d at 367. If a person meets this higher burden, however, relief is mandatory. Id.
The CAT “prohibits the United States from returning any person to a country where the person has demonstrated that it is more likely than not that [s]he will be tortured if returned to such country.” Zelaya v. Holder, 668 F.3d 159, 161 (4th Cir.2012). The reason that the person would be tortured is irrelevant; all that matters is that the person has shown that torture is more likely than not, Dankam, 495 F.3d at 115-16, applying an objective standard, Camara, 378 F.3d at 371. As with asylum and withholding of removal claims, the petitioner bears the burden of showing these requirements are met. 8 C.F.R. § 208.16(c)(2).
III.
Djondo argues that the record does not support the BIA’s decision and that the BIA did not follow the REAL ID Act in making the adverse credibility determination, but we disagree. Applying these standards, we conclude that the record contains substantial evidence to uphold the BIA’s decision.
The BIA rejected Djondo’s assertion that the simple mistake of one date was the basis for the adverse credibility determination. Instead, the BIA noted that the mistaken date appears not only in Djon-do’s testimony and written application, but also in Gnininvi’s testimony and affidavit and in the statement from Edoh Komla. Far from being a one-time mistake, this repeated error was the only specific date that Djondo offered for the date of the rally in any of the oral or written evidence from people who claimed to have firsthand knowledge of events. This error—from Djondo, Gnininvi, and Komla — directly conflicted with the date of the rally noted in reports from the State Department and Amnesty International, which the IJ found “far more probative.”[3] J.A. 300-01. The IJ asked Djondo about this mistake, and the IJ did not credit her answer that she simply forgot or could not remember. J.A. 4, 14-16. Given that the IJ heard Djondo’s testimony and explanation for the incorrect date, the IJ’s rejection of that explanation deserves great deference. See Concrete Pipe & Products of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 623, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (noting that “the fact-finder is in a better position to make judgments about.... the credibility of a live witness”).
In addition, in reaching its adverse credibility determination, the BIA fully complied with the requirements of the REAL ID Act. The BIA and the IJ both expressly cited the REAL ID Act and noted that their decisions were based on “the totality of the circumstances.” J.A. 4, 14. The BIA was not required to discuss—or even list—every factor in the REAL ID Act in discussing Djondo’s credibility. Cf. Zuh v. Mukasey, 547 F.3d 504, 511 (4th Cir.2008) (holding, in the context of the BIA exercising its discretion in denying asylum to an *343 alien qualifying as a refugee, that “an IJ need not analyze or even list every factor”). Djondo contends that the BIA should have responded to more of her arguments about why her testimony was credible, but the REAL ID Act imposes no such requirement. The REAL ID Act merely requires that the BIA’s decision be based on the totality of the circumstances and all relevant factors. The BIA and the IJ based their decisions on that standard, J.A. 4, 14, and in their decisions, both discussed the evidence and factors on which their conclusion was based.[4] They gave a cogent reason — the repeated wrong date—as the basis for the decision. See Tewabe, 446 F.3d at 538. The decision therefore satisfied the requirements of the REAL ID Act.
Despite Djondo’s assertion to the contrary, the BIA did not need to explain why this erroneous date was material.[5] Before Congress passed the REAL ID Act in 2005, “contradictions that [did] not go to the heart of the applicant’s claim ... [did] not necessarily support an adverse credibility determination.” Djadjou, 662 F.3d at 274. The REAL ID Act, however, changed this standard, removing this materiality requirement and thus allowing any inconsistency or inaccuracy, “without regard for whether [it] goes to the heart of the applicant’s claim,” to serve as the basis of an adverse credibility determination. 8 U.S.C. § 1158(b)(1)(B)(iii); see also Singh v. Holder, — F.3d - (4th Cir.2012) (recognizing this change resulting from the REAL ID Act). Here, the BIA relied on the same repeated use of the wrong date for the rally as the basis for the adverse credibility determination. The REAL ID Act allows the BIA to make the adverse credibility determination based on this error, whether or not it went to the heart of Djondo’s claim.
In addition to the repeated error about the date, the BIA also considered and rejected the other evidence that Djondo presented. See Camara, 378 F.3d at 369-70 (noting that although an adverse credibility determination is often “fatal” to an asylum claim, such a finding is not necessarily fatal if the other evidence can demonstrate past persecution). In this case, the letter attesting to Djondo’s CDPA membership never mentioned any persecution, despite being obtained for purposes of Djondo’s asylum claim. J.A. 5, 646. The letters from Togolese citizens offered little or no specifics about the rally at which Djondo claimed she was beaten. J.A. 16-17, 653-87. The photographs did not show Djondo in the crowd. J.A. 5, 703-04. The BIA thus sufficiently considered and rejected this evidence in evaluating Djondo’s application. See Gandziami-Mickhou v. Gonzales, 445 F.3d 351, 358 (4th Cir.2006) (holding that the IJ does not *344 need to “discuss each item’s individual worth” in rejecting these documents as incredible, so long as the IJ did not ignore them).
Because Djondo offered the same evidence in support of all three claims, the rejection of her evidence for purposes of one claim means that the evidence must be rejected for all claims. See Zuh, 547 F.3d at 513 (“An IJ cannot have it both ways, finding an applicant and [her] documents incredible for one purpose and yet relying on them for another.”). Thus, Djondo’s claims for asylum, withholding of removal, and protection under CAT all fail.
IV.
Ultimately, Djondo’s evidence does not compel us to reach a result contrary to the BIA’s conclusion. Regardless of whether another factfinder would have found Djon-do’s claim credible, the BIA found that Djondo was incredible and had not carried her burden to show that she was entitled to asylum, withholding of removal, and protection under CAT. The record contains substantial evidence to support that conclusion. Therefore, we affirm the BIA’s decision and deny the petition for review.

PETITION FOR REVIEW DENIED.

. Of these six written statements, only this one provided a specific date for the rally.

. This was the second time the IJ had rejected Djondo's claim. The first time Djondo's application was denied, the IJ refused to consider the documentary evidence because the translation certifications did not comply with applicable rules. Djondo appealed, and the BIA remanded the case with instructions to consider that evidence.

. Djondo’s evidence raises other questions as well. For instance, Djondo testified that after she arrived at her cousin’s house, her cousin took her to the hospital. J.A. 592. Her cousin, however, never mentioned any trip to the hospital in his written statement; instead, he said that he had to "hide her” in his house "to save her.” J.A. 678.

. In Zuh, we noted that when the BIA decides, in its discretion, to deny asylum to a qualifying refugee, the IJ "must discuss the positive or adverse factors that support his or her decision." Zuh, 547 F.3d at 511. Djondo argues that this language required the IJ to discuss the factors that suggested her claim was credible. The language on which Djondo relies does not compel such a result: that language uses "or,” meaning that the IJ need not discuss both positive and adverse factors; rather, the IJ need only discuss the factors that support the decision. So long as the record demonstrates that the IJ considered the relevant factors, the IJ has met her obligations. See id. Here, the BIA and IJ did just that. J.A. 4, 14.

. The mistaken date is, in any event, likely very material. Djondo claimed the rally was designed to push Faure Gnassingbe to step down after his extraconstitutional installation as president. J.A. 623. On February 20, 2005, this purpose would have made sense, as Faure Gnassingbe was still in power. On February 27, 2005, however, this purpose would not have made sense because Faure Gnassingbe had stepped down two days earlier, on February 25.